The opinion of the court was delivered by
Kingman, C. J.:
This is an action for the recovery of certain real estate, brought by the plaintiff in error against the defendant in error. A jury was waived, and the case was tried by the court. Special findings of facts and conclusions of law were made by the court, and judgment was rendered for the defendant. To the findings of facts no exception was taken; so that under our law, the facts so found must be taken as true. To each of the conclusions of law the plaintiff in error excepted, and also moved for judgment on the facts found. The land in controversy has become valuable, and is described by plaintiff in error as “special section 11, in township 12 south, of range 5 east, in Davis county,” and by the defendant in error as “fractional section 1, in township 12 south, of range 5 east, containing 532 acres.” It is not important to state the causes for the variant descriptions, for the land is identified, as being the land in controversy by the facts found. The plaintiff holds under a patent from the United States; the defendant under an alleged grant to itself before the plaintiff had any title. The defendant claims that it became the owner of' the land by the joint resolution of congress approved July 26, 1866, and the subsequent action of the president on the 19th of July, 1867. The joint resolution is as follows:
*411 “A Resolution granting the right of way through military reserves to the Union Paoijic, Railroad Company and its branches.
“ Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That, subject to approval by the president, the right of way, one hundred feet in width, is hereby granted to-the Union Pacific Railroad Company and the companies constructing the branch roads connecting therewith, for the construction and operation of their roads oyer and upon all military reserves through which the same may pass; and the president is hereby authorized to set apart to the Union Pacific Railway Company, eastern division, twenty acres of the Fort Riley military reservation, for depot and other purposes, in the bottom opposite Riley City; also fractional section 'one’ on the west side of said reservation near Junction City, for the same purposes; and also to restore from time to time, to the public domain, any portion of said military reserve over which the Union Pacific Railroad or any of its branches may pass, and which shall not be required for military purposes: Provided, That the President shall not permit the location of any such railroad, or the diminution of any such reserve in any manner so as to impair its usefulness for military purposes, so long as it shall be required therefor.” Approved, July 26, 1866. (14 U. S. Stat. at Large, 367; 2 Lester’s Land Laws, 204.)
In pursuance of said joint resolution the President did, on the 19th of July 1867, by an executive order of that date, approve of “the aforesaid grant specified in said joint resolution,” and did set apart to the Union Pacific Railway Company, eastern division, (now known by the name of the Kansas Pacific Railway Co.,) fractional section one, township 12 south, of range 5 east, and there was attached to said order a map showing the lands described' therein. The joint resolution quoted, and the executive order referred to, constitute the defendant’s title.
The patent of the plaintiff bears date June 13th, 1868; but plaintiff claims that his right dates from the passage of a joint resolution of Congress approved March 2d, 1867, after the joint resolution under which defendant claims was adopted, but before the executive order was made. This *412 joint resolution of March 2d, 1867, covers the land in controversy, and is as follows:
“Joint Resolution for the reduction of the military reservation of Fort Riley, and to grant land for bridge purposes to the State of Kansas.
“Be it Resolved by the Senate and FTouse of Representatives of the United States of America in Congress assembled, That the southwestern boundary of the military reservation of Fort Riley, in the state of Kansas, be, and the same is hereby, declared to be hereafter the channel of the Republican river from its mouth to the point where said river intersects the present western line of said reservation, and the land released from said reservation, and lying between the Smoky Hill and Republican rivers, is hereby granted to the state of Kansas to aid in the construction of a bridge over the Republican river, on the public highway leading through the present reservation ; but upon the express condition that this grant shall be accepted by the state of Kansas, with a guaranty given by said state, by an act of the legislature thereof, that said bridge shall be kept up and maintained in good condition, and shall be free to the use of the government of the United States for all transit purposes forever, without tolls dr charges; and on such acceptance and guaranty being filed in the office of the Secretary of the Interior, together with the certificate of the governor of Kansas, that a good and permanent bridge has been constructed over the said Republican river, it shall be the duty of said secretary to issue patent, for the land hereby granted, to the state of Kansas, or to such company as may be authorized by act of the legislature of said state to construct said bridge: Provided however, That nothing herein contained shall be construed to interfere with any grant of any part of said land heretofore made by the United States.” Approved March 2, 1867. (14 U. S. Stat. at Large, 573; 2 Lester’s Laws, 212.)
On the 26th of February, four days before this joint resolution was adopted, the state of Kansas passed a law, accepting the grant upon the terms therein named, and with the guaranty therein required, and authorized the Republican River Bridge Company to construct the bridge and receive the land mentioned. (Laws of 1867, p. 58.) The company built the bridge, made the necessary proofs thereof, and received the patent for the land.
*413 It will be convenient to see, first, what is the true meaning of the joint resolution of July 26, 1866. If that resolution made a grant of the land, whether it was absolute or upon condition, or that would become absolute upon any contingency, then that fact must necessarily end the case; for if it was a grant of any kind, then it was excepted by the proviso from the land granted to the state by the joint resolution of March 2,1867. It is a recognized rule, that grants of this description are strictly construed against the grantees. (Dubuque & Pacific Rly. Co. v. Litchfield, 23 How., 66.) That is, the language of the law must receive such a construction, if practicable, as to effect the intention of the grantor; but if the words are ambiguous, the true rule is to construe them most strongly against the grantee. (Railroad Co. v. Rice, 1 Black, 360.) Another rule is, that a statute should be so construed that effect be given if possible to every clause and section of it. The resolution, then, must be held to be a grant of the land in controversy, or that part of it which treated of this land has no effect whatever. The action of the President might confirm and make certain the right; but unless the right first emanated from congress, his acts would confer nothing, for the President of the United States has no power to dispose of the lands of the United States in any case, unless under the provisions of law; and then the law is the source of the right, not the executive action. Whatever fight the defendant has or could have obtained has its source in the joint resolution, and must be dependent upon it for its validity. It is unquestionably true that the defendant’s title was by the terms of the resolution made dependent upon the executive action; and till he acted, no title vested in defendant; but the President’s power to act was derived from the law. The court cannot ignore that part of the resolution that gives some right to the defendant in this land. It matters little, so far as this action is concerned, whether this right was perfect at the time, or was dependent upon some contingency or condition in the future. In any event, if there ever could be any title growing out of the resolution and the action of the *414 President, then this makes it a grant, and brings it within the exception of the proviso of the joint resolution granting the land to the state. Taking the resolution and the proviso together, it seems to us that the fair reading is, that it is a grant of the land in controversy, dependent upon the determination of the President as to whether the same would impair the usefulness of the reserve for military purposes; and this seems to be the interpretation of it by the President in his order, which seems- wholly based upon the resolution and the report of Gen. Sherman that the fractional section one “can also be granted the company without impairing the usefulness for military purposes of the reservation.” Even if the right was dependent upon the executive will, without reference to any existing facts, so that it was a mere matter of fancy whether he would sanction it or not, still, when he made his order we think it gave to defendant a complete title to the land. If this is so, then some right conditional in its character passed to the defendant by the resolution. • It is insisted that the terms of the resolution do not grant the land in fee-simple, but as a mere easement thereon, for uses proper to the purposes of defendant as a railroad corporation, and that the use of 500 acres of the land for other than railroad uses has forfeited the easement granted in the land. This would be a strained construction of the language used, and inconsistent with the general policy of congress. After giving the right of way, then 20 acres are given for depot and other purposes, and then, near by, this fractional section one, containing 532 acres, is set apart to the defendant for the same purposes. We cannot say that the other purposes meant anything less than the right of defendant to put the land to such uses as would be most to its advantage. It certainly would not be good policy to have held so large a body of land, so situated and as valuable as this, from occupation and use; nor would it have been consistent with the legislation of congress in its grants of land to railway corporations, that these companies should become the holders of large tracts of land and hold them against the occupation of citizens. In *415 deed, in the grant to this company of land to aid in the building of its road, it is provided that the granted lands, not sold within three years after the completion of the road, shall be subject to entry under the pre-emption laws.
It is further insisted that the words “set apart” in the resolution do not imply a grant. Taken by themselves, that is no doubt true; but as used in this connection they show that a part of the public domain was included in a reservation for military purposes, which the President was authorized to separate from the rest of the reservation, and set apart to the use of the defendant. No form of words is necessary to make a grant.
It seems that not only the President, and the Secretary of War — a great lawyer — entertained the opinion that this resolution was a grant of the land, but that Congress must have understood it in the same way; for at the next session it excepted from the land granted to the state, and now claimed by the plaintiff, “any grant of any part of said land heretofore made by the United States.” There was no grant of this land unless this resolution made one to the defendant.
This conclusion disposes of the case, and renders it unnecessary to consider another question raised on the title of plaintiff; and that is, whether the acceptance of the grant made in the joint resolution of March 2d, 1867, by the legislature of Kansas, four days before the resolution passed Congress, was such an acceptance and guaranty as the resolution required before any right attached, and what effect the issuance of the patent had on that irregularity.
The judgment must be affirmed.
All the Justices concurring.